Filed 8/29/25  P. v. Bowman CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D083541 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD127034) |
| DEAUNDRE BOWMAN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, John M. Thompson, Judge.  Affirmed.

Joseph Doyle, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Daniel Rogers, Amanda Lloyd and Alana C. Butler, Deputy Attorneys General, for Plaintiff and Respondent.

Deaundre Bowman appeals from an order denying his petition for resentencing on a 1998 murder conviction under former Penal Code[1] section 1170.95 (now section 1172.6).[2] After an evidentiary hearing, the trial court concluded Bowman was a major participant in the underlying attempted robbery who acted with reckless indifference to human life. Accordingly, the court found Bowman guilty of murder under a still-valid theory of liability.

Bowman argues on appeal that the record does not contain sufficient evidence to support the court's finding that the prosecution met its burden, under current law, of proving him guilty of murder beyond a reasonable doubt. He also argues that the court failed to properly consider his youth in determining whether he acted with reckless indifference to human life.

Having considered the relevant factors set forth in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), we conclude there is sufficient evidence to support the court's finding that Bowman was a major participant in the attempted robbery and that he acted with reckless indifference to human life. Also, because the evidentiary hearing was held in January 2024, and there is no contrary indication in the record, we must presume the court followed then-established case law identifying youth as a relevant factor in the reckless indifference analysis. Accordingly, we affirm.

---

[1] Undesignated statutory references are to the Penal Code.

[2] Senate Bill No. 1437 (Senate Bill 1437) (2017-2018 Reg. Sess.) enacted section 1170.95, which was renumbered to section 1172.6 without substantive change in the text. (Stats. 2022, ch. 58, § 10 [effective June 30, 2022].) We will refer to this statutory provision as section 1172.6 for the purposes of this opinion.

FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Killings*

In 1997, Charles Downing sold cocaine out of his friend J.R.'s studio apartment in San Diego.  People frequently came and went from J.R.'s apartment, and Joseph Jackson lived across the street from J.R.  Jackson, Bowman, and Kevin Sumner, who were friends, also sold drugs in the neighborhood.  Pamela F. was J.R.'s friend and lived with him and another person in his apartment.  She frequently bought cocaine from Jackson.

In the evening on January 30, 1997, Pamela saw Jackson, Bowman, and a few others in front of a liquor store near J.R.'s apartment.  Jackson or Bowman asked her why she was not buying drugs from them anymore, and she told them she was buying from Downing.  Either Jackson or Bowman said that they should "go over there and turn it out," which Pamela understood to mean "going somewhere to stop somebody from doing something."  She thought they were "playing around" and "didn't believe them."  They parted ways and Pamela went back to J.R.'s apartment.

That same evening, Louis G. was leaving J.R.'s apartment when Sumner saw Louis and asked him for five dollars that Louis owed him from losing a bet.  Jackson, Bowman, and some others were standing in front of the apartment with Sumner.  After Louis told Sumner he did not have the money, Bowman approached Louis and asked, "You smoke dope, don't you?"  After Louis replied that he did, Bowman asked, "Where is my friend's money?"  Bowman then punched Louis in the jaw with a closed fist.  Sumner and someone else in the group started running toward Louis, but he was able to get away.  As he was running, Louis heard someone say, "shoot him."  Louis was "pretty sure" Bowman said it, but could not be certain.

3

Around 10:00 p.m., Pamela, J.R., Linda Lewis, Downing, and Downing's wife Sonja were in J.R.'s apartment. Pamela, J.R., and Lewis were in the bathroom "getting high and getting ready to go back out to the streets" when Jackson came into the apartment with Bowman and Sumner following him. Jackson had a gun in his hand and announced, "This is a robbery." He pointed the gun at Downing and said, "you're going to die," or something to that effect. He also demanded to know who was selling drugs. Meanwhile Bowman, who also had a gun and wore a blue bandana covering the lower half of his face, forced his way into the bathroom, "grabbed" Lewis and J.R., and made them join the others. Then Bowman began searching the cabinets and refrigerator while Sumner stood by the front door.

Downing admitted that he was selling drugs but said that he was "sold out." At some point Jackson told Downing to get on the ground, so Downing got on one knee. A witness testified that during this time, Bowman was holding his gun out "to let everyone see it." Jackson asked Downing whether he thought he was "tough" or "macho." Sonja offered to take Jackson somewhere else to get "money, drugs, whatever" he wanted, but Jackson told her to "shut up" or she would "be the first one" to die.

Jackson then pointed the gun back at Downing and told him to lie down on the ground on his stomach. According to witnesses, Bowman said something to Jackson along the lines of "go ahead and get it over with" and "do what you came here to do." Jackson then started shooting. He shot Lewis in the head, Downing in the chest, and J.R. in the chest and leg. He shot at Pamela but missed her as she ran out the front door. Jackson shot Sonja in the leg, and while his attention was elsewhere, Sonja dived to the floor and pretended to be dead before he shot her once more in the other leg. After Jackson, Bowman, and Sumner fled, Sonja was able to drive to a phone

4

booth and call 911. J.R., Sonja, and Pamela survived the shooting, but Lewis and Downing died at the scene. Witnesses estimated that the encounter lasted between five and 15 minutes, with some stating that "it happened so fast" or "pretty fast."

Soon after the killings, Jackson and Bowman fled to Oakland, California, and Sumner went to Arkansas. Less than two weeks later, law enforcement arrested Jackson. Police apprehended Bowman and Sumner several months later.

B.    *Sumner's Trial Testimony*

Sumner testified in his own defense at trial. He said that the night of the shootings, he, Jackson, and Bowman pooled their cash together and went to J.R.'s apartment with the intent to buy drugs to resell. After they were let into the apartment, Sumner stepped outside to "get a breather" from the smell of crack smoke inside. When he went back into the apartment because he heard arguing, he saw Jackson holding a gun, yelling and waving it around the room. Sumner said he stood just inside by the door for about 30 seconds before Jackson fired the first shot, at which point Sumner ran out of the apartment.

After the shooting, Jackson called Sumner that same night to ask if he wanted to go to Oakland with him and Bowman, but Sumner declined. The next day, Jackson and Bowman went to Sumner's house. Jackson displayed a gun and told Sumner that he "better not tell" and that if he did, they would all go to prison for life or get "the death chair." Jackson also told Sumner that his little brother was "around here talking" and Sumner "better get [his] brother." While Jackson was telling Sumner this, Bowman was "standing there," laughing. Sumner left for Arkansas soon thereafter.

5

Sumner also testified that earlier in the evening before the shootings, Sumner, Jackson, and Bowman were at a party about a block from J.R.'s apartment. Jackson had a gun at the party. Sumner said that at some point while he, Jackson, and Bowman were walking with a group leaving the party, Jackson or someone else fired the gun into the air, causing everyone to run. During a post-arrest interview, Sumner told a detective that he first saw Jackson with a gun outside of Jackson's apartment, not at a party. Sumner also said Jackson was showing off and fired the gun in front of his apartment. Police found a bullet casing in the courtyard of Jackson's apartment building that was fired from the same gun used in J.R.'s apartment.

### C.    *Jury Verdict and Direct Appeal*

In 1998, a jury found Bowman guilty of conspiracy to commit robbery (§ 182, subd. (a)), two counts of first-degree murder (§ 187, subd. (a)), three counts of attempted murder (§§ 664/187, subd. (a)), three counts of assault with a firearm (§ 254, subd. (b)), five counts of attempted robbery (§§ 664/211), and one count of burglary (§ 459). As to all counts, the jury found that Bowman personally used a firearm (§ 12022.5, subd. (a)(1)) and was personally armed with a firearm (§ 12022, subd. (a)(1)). The jury also made true findings on special circumstances allegations. (§ 190.2, subd. (a)(3) [multiple murders]; § 190.2, subd. (a)(17) [murder committed during a robbery and a burglary].) Bowman was sentenced to a determinate term of 20 years in state prison, two consecutive life terms without the possibility of parole, and three consecutive life terms with the possibility of parole. We affirmed his conviction on direct appeal. (*People v. Bowman, et al.* (Jan. 19, 2001, D032440) [nonpub. opn.].)

## D. Bowman's Petition for Resentencing

Bowman filed a petition for resentencing under section 1172.6 in 2021, and the trial court conducted an evidentiary hearing under section 1172.6, subdivision (d), after finding the petition stated a prima facie case. After reviewing the trial transcript, receiving a stipulation summarizing Pamela's testimony, and hearing arguments from both sides, the court found that Bowman was guilty of murder because he was a major participant in the attempted robbery and acted with reckless indifference to the victims' lives. Citing *Banks* and *Clark*, the court first found that Bowman "played a critical role" and was present when either he or Jackson decided to "turn out" the apartment, was present for the attempted robbery of Louis, and went to the apartment armed with a gun. The court also noted that Bowman ransacked the apartment looking for drugs and money.

As for reckless indifference, the court found that Bowman was armed, he knew that Jackson was armed, and the evidence showed they went to the apartment "to eliminate the competition." Bowman was present in the apartment when the shootings occurred and when "the plan was hatched." The court emphasized that instead of preventing the murders or intervening, Bowman ransacked the apartment and then urged Jackson "to do what they came there to do." After the shootings, Bowman made no effort to "assist any victims," did not attempt to call the police, and then left the county. Regarding Bowman's knowledge that Jackson might kill, the court noted evidence that Bowman was present when Jackson fired his gun earlier that evening. The court reiterated that both Bowman and Jackson were armed, Bowman watched as Jackson pointed his gun at the victims, and then Bowman encouraged Jackson to commit the murders. The court also

7

observed that before the shootings, Bowman assaulted Louis and was present when someone yelled "shoot him" when Louis was running away.

At the conclusion of the hearing, the court found that the People had met their evidentiary burden and it denied Bowman's petition.

DISCUSSION

I

Bowman first contends the record contains insufficient evidence to sustain the court's finding that he was a major participant in the attempted robbery who acted with reckless indifference to human life. We disagree.

### A.    *Governing Law*

Senate Bill 1437 was enacted " 'to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' (Stats. 2018, ch. 1015, § 1, subd. (f).)" (*People v. Martinez* (2019) 31 Cal.App.5th 719, 723.) It implemented this goal by amending section 188, which defines malice, and section 189, which defines the degrees of murder. (Stats. 2018, ch. 1015, §§ 2 & 3.)

Under the new legislation, a petitioner who files a petition and makes a prima facie showing he could not presently be convicted of murder under the amendments to the murder laws is entitled to an evidentiary hearing. (§ 1172.6, subds. (c), (d)(1).) At the hearing, the prosecution bears the burden "to prove, beyond a reasonable doubt, that the petitioner is guilty of murder" under the amended laws. (§ 1172.6, subd. (d)(3).) "[T]he superior court acts as an independent fact finder and determines whether the People have met their burden in proving the defendant guilty of murder." (*People v. Henley* (2022) 85 Cal.App.5th 1003, 1016 (*Henley*).) "If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and

8

enhancements attached to the conviction, shall be vacated." (§ 1172.6, subd. (d)(3).)

To demonstrate that a defendant who was not the actual killer was nonetheless a major participant in the underlying felony who acted with reckless indifference to human life, the prosecution must show that the defendant " ' "knowingly engag[ed] in criminal activities known to carry a grave risk of death." ' " (*Banks, supra*, 61 Cal.4th at p. 801.) "The defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed, demonstrating reckless indifference to the significant risk of death his or her actions create." (*Ibid.*) But "participation in an armed robbery, without more, does not involve 'engaging in criminal activities known to carry a grave risk of death.' " (*Id.* at p. 805.)

In *Banks*, our Supreme Court compiled the following list of factors to be considered in determining whether a participant's role should be considered "major": (1) the defendant's role in planning the crime that led to one or more deaths; (2) the defendant's role in supplying or using lethal weapons; (3) the defendant's awareness of "particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants"; (4) whether the defendant was present at the scene of the killing and in a position to facilitate or prevent the murder; and (5) the defendant's actions after lethal force was used. (*Banks, supra*, 61 Cal.4th at p. 803.) No one factor is dispositive. (*Ibid.*)

The next year, our high court returned to this issue in *Clark*, endorsed the *Banks* factors, and sought to further define "reckless indifference to human life." (*Clark, supra*, 63 Cal.4th at p. 611.) To aid in courts' analyses of whether a defendant exhibited reckless indifference, the court offered the following factors: (1) the defendant's "knowledge of weapons, and use and

9

number of weapons"; (2) the defendant's "physical presence at the crime and opportunities to restrain the crime and/or aid the victim"; (3) the "duration of the felony"; (4) the "defendant's knowledge of cohort's likelihood of killing"; and (5) the "defendant's efforts to minimize the risks of the violence during the felony." (*Id.* at pp. 618–621, capitalization omitted.) The court explained that the requirements of being a major participant and having reckless indifference to human life " 'significantly overlap . . . , for the greater the defendant's participation in the felony murder, the more likely [the defendant] acted with reckless indifference to human life.' " (*Id.* at pp. 614–615.)

### B. Standard of Review

We review the trial court's factual findings at a section 1172.6 evidentiary hearing for substantial evidence. (*Henley, supra*, 85 Cal.App.5th at p. 1017.) We view the record in the light most favorable to the judgment to decide if the prosecution introduced sufficient evidence—reasonable, credible evidence of solid value—to support a finding of guilt beyond a reasonable doubt. (*Ibid.*) We will affirm unless there is no hypothesis upon which sufficient substantial evidence exists to support the trial court's decision. (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) We must "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Jones* (1990) 51 Cal.3d 294, 314.) "An appellate court must accept logical inferences that the [trier of fact] might have drawn from the circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396.)

### C. Major Participant

We conclude that substantial evidence supports the trial court's finding that Bowman was a major participant in the attempted robbery. As to the

10

first *Banks* factor regarding Bowman's role in planning the crime, Pamela testified that either Bowman or Jackson proposed going to J.R.'s apartment to "turn it out" after learning that Pamela was buying drugs from Downing. Bowman and Jackson were friends and spent time together in the hours leading up to the killings, which supports the inference that Bowman was involved in the planning. Bowman also sold drugs in the neighborhood and had a financial incentive to participate. He armed himself with a gun and wore a bandana over his face, indicating that he prepared in advance. Although he may not have been the ringleader, Bowman instructed Jackson to "go ahead and get it over with" and "do what you came here to do[,]" which implies Bowman at least knew and agreed to what Jackson had planned. The evidence thus supports the conclusion that Bowman had a significant role in planning the underlying felony.

The second factor—Bowman's role in supplying or using lethal weapons—also supports finding that he was a major participant. Bowman was not only armed, he also displayed his gun during the offense "to let everyone see it." Although there is no evidence that Bowman gave Jackson the gun he used to commit the murders, the evidence shows Bowman wielded a firearm to provide backup for Jackson. Being armed also made it easier for Bowman to coerce Lewis and J.R. out of the bathroom and into the same room as Jackson, exposing them to danger.

Next, the trial court could reasonably conclude that Bowman was aware of the "particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants." (*Banks, supra*, 61 Cal.4th at p. 803.) As the trial court observed, Bowman himself showed a propensity for violence when he assaulted Louis shortly before committing the underlying felony. Bowman was also present when someone yelled "shoot

11

him" as Louis ran away. It is reasonable to infer that Bowman knew there would be multiple people in J.R.'s apartment based on evidence Bowman also dealt drugs in the neighborhood, and people were often seen coming and going. Bowman's own drug-dealing would also make him aware of the increased dangers of robbing or confronting a rival drug dealer. Importantly, there is evidence that Bowman was present when Jackson fired his gun earlier in the evening, which supports an inference he knew Jackson had a loaded weapon and was willing to use it. All this evidence, while circumstantial, supports a finding that Bowman was aware of a heightened risk of violence. (See *People v. Zamudio* (2008) 43 Cal.4th 327, 357 [reviewing court must accept any logical inferences the trier of fact might have drawn from the circumstantial evidence].)

As for the fourth factor, Bowman does not dispute that he was present in the apartment immediately before and during the killings. (*Banks, supra*, 61 Cal.4th at p. 803.) But he was more than merely present. The three defendants were outnumbered in the apartment, and the evidence shows Bowman facilitated the murders with his armed presence. As noted, he gathered two of the victims and placed them in harm's way. There is no evidence he took any steps to diffuse the situation, even after observing Jackson point his gun at the victims and threaten them with death. (See e.g., *People v. Montanez* (2023) 91 Cal.App.5th 245, 279 [finding sufficient evidence of the fourth *Banks* factor where, among other things, the defendant was at the crime scene for the entire sequence of events leading up to the shooting and "had the ability and opportunity to help reduce the foreseeable risk [his accomplice] would use lethal force against the victims" but "did nothing"].) Indeed, Bowman did the opposite, approaching Jackson and encouraging him to "get it over with."

12

Finally, the fifth factor supports the court's finding that Bowman was a major participant based on his conduct after lethal force was used. (*Banks, supra*, 61 Cal.4th at p. 803.) It is undisputed that Bowman neither stayed to aid any of the victims nor called 911. There are instances where this factor is neutral because multiple inferences can be drawn from a defendant's failure to assist the victims. (See, e.g., *In re Scoggins* (2020) 9 Cal.5th 667, 679 ["when different inferences may be drawn from the circumstances, the defendant's actions after the shooting may not be very probative of his mental state"]; *Clark, supra*, 63 Cal.4th at p. 620 [finding the ambiguous circumstances surrounding the defendant's hasty departure made it difficult to infer his frame of mind concerning the victim's death].) Here, however, there is evidence that Bowman not only fled the scene, but he accompanied Jackson to Sumner's home to threaten him, laughed when Jackson did so, and then fled with Jackson to the same city. Given that this and each of the preceding *Banks* factors weighs in favor of finding that Bowman was a major participant, we conclude the court's determination is supported by substantial evidence.

D.     *Reckless Indifference to Human Life*

We turn next to the *Clark* factors—which significantly overlap with the *Banks* factors—to consider whether substantial evidence supports that Bowman acted with reckless indifference to human life. (See *People v. Strong* (2022) 13 Cal.5th 698, 706.) First, we look to Bowman's knowledge that weapons would be used and of the number of weapons used. (*Clark, supra*, 63 Cal.4th at p. 618.) As previously discussed, Bowman knew Jackson had a loaded gun, and Bowman himself was armed. The mere awareness that one's cohorts are armed and that armed robberies carry a risk of death is not alone sufficient to show the requisite mental state. (*Banks, supra*, 61 Cal.4th at

13

p. 809.)  However, when Bowman's awareness is coupled with evidence that he knew Downing was a rival drug dealer and that Jackson had already shown he was willing to fire his weapon earlier in the evening, this factor weighs in favor of a reckless indifference finding.  (Cf. *People v. Emanuel* (2025) 17 Cal.5th 867, 885 [first *Clark* factor did not weigh in favor of finding reckless indifference because no evidence demonstrated defendant's prior awareness that actual killer possessed a gun, would bring the gun to the robbery, or was likely to use lethal force].)

The second factor, physical presence at the scene and the opportunities to restrain the crime or aid the victim, is similar to the fourth and fifth *Banks* factors.  (*Banks, supra*, 61 Cal.4th at p. 803; *Clark, supra*, 63 Cal.4th at p. 619.)  As we have noted, Bowman not only failed to act as a restraining influence, but he encouraged Jackson to carry out the crime.  Bowman helped round up the victims, stood by as Jackson threatened them with death, and then egged him on in the final moments before the killings.  As our high court has explained, "[p]roximity to the murder and the events leading up to it may be particularly significant where . . . the murder is a culmination or a foreseeable result of several intermediate steps, or where the participant who personally commits the murder exhibits behavior tending to suggest a willingness to use lethal force."  (*Clark, supra*, 63 Cal.4th at p. 619.)  Where, as here, the defendant can observe his cohorts' actions, " 'it is fair to conclude that he shared in their actions and mental state.' "  (*Ibid.*)  Additionally, where the defendant has the opportunity to " 'act as a restraining influence' " but fails to do so, " 'the defendant is arguably more at fault for the resulting murders.' "  (*Ibid.*)  In this case, where Bowman not only failed to restrain Jackson but actively encouraged him to carry out the shooting, it is eminently

14

reasonable to infer Bowman shared Jackson's reckless indifference to human life.

The third factor takes into account the duration of the crime and whether there was a greater window of opportunity for violence. (*Clark, supra*, 63 Cal.4th at p. 620.) *Clark* explained that "[w]here a victim is held at gunpoint, kidnapped, or otherwise restrained in the presence of perpetrators for prolonged periods, 'there is a greater window of opportunity for violence' [citation], possibly culminating in murder." (*Ibid*.) Thus, in determining whether a defendant exhibited reckless indifference to human life, "[c]ourts have looked to whether a murder came at the end of a prolonged period of restraint of the victims by defendant." (*Ibid*.) Here, witnesses estimated that the encounter only lasted for several minutes, which the People acknowledge is a relatively short duration. (See *In re Bennett* (2018) 26 Cal.App.5th 1002, 1024 [describing minutes-long encounter as "negligible" in concluding that the duration of the felony did nothing to increase the risk of violence beyond that inherent in the crime].) Witnesses also testified that the events unfolded quickly. We conclude that the *Clark* factor concerning duration of the crime is neutral in this case; it did nothing to heighten the risk of violence beyond that inherent in the robbery itself.

We briefly address the fourth *Clark* factor, which like the third *Banks* factor requires weighing Bowman's knowledge of Jackson's likelihood of killing. (*Clark, supra*, 63 Cal.4th at p. 621.) We acknowledge that the facts here are distinguishable from cases like *Tison v. Arizona* (1987) 481 U.S. 137, 151–152, where the defendants knew their father was capable of deadly violence because he had murdered a prison guard. But as we have explained, the record contains sufficient circumstantial evidence to show that Bowman knew Jackson was willing to use violence.

Finally, *Clark* instructs that if the defendant raises an argument that he tried to minimize the risk of violence, courts should consider it as part of their reckless indifference analysis. (*Clark, supra*, 63 Cal.4th at p. 622.) The *Clark* court cautioned, however, that such evidence "does not, in itself, necessarily foreclose a finding that defendant acted with reckless indifference to human life." (*Ibid.*) Bowman makes no such argument here, choosing instead to focus only on the first four factors. We see no evidence that he attempted to minimize the risk of violence.

When viewing the record in the light most favorable to the trial court's denial of the resentencing petition, and "after considering those aspects of the present felony that provide insight into both the magnitude of the objective risk of lethal violence and [the] defendant's subjective awareness of that risk" (*Clark, supra*, 63 Cal.4th at p. 623), we conclude that substantial evidence supports the trial court's findings that Bowman was a major participant in the robbery and acted with reckless indifference to human life.[3]

## II

Bowman contends that because he was 19 years old at the time of the offense, the trial court erred because there is no evidence in the record that it considered his youth and its impact on his mental state. The People argue that even though the court did not specifically address Bowman's youth in its ruling, the defense raised the issue below, and we must presume that the court followed the law. We agree with the People.

Bowman's evidentiary hearing was held in January 2024. By that time, cases had been published stating that courts should consider the age of

---

[3] For the reasons discussed here and in the next section, we are not persuaded by Bowman's argument that his conviction violates his Fourteenth Amendment rights.

young adult offenders—not just offenders under the age of 18—in resentencing petitions involving the *Banks/Clark* factors or implied malice. (See, e.g., *People v. Pittman* (2023) 96 Cal.App.5th 400 [reversing denial of resentencing petition and remanding for the trial court to consider youth of defendant, who was 21 years old at the time of the offense]; *People v. Jones* (2022) 86 Cal.App.5th 1076 (*Jones*) [reversing and remanding for the trial court to consider youth of defendant who was 20 years old at the time of the offense]; see also *People v. Harris* (2021) 60 Cal.App.5th 939, 960 [finding defendant's youth was relevant to his awareness of dangers under *Banks/Clark* factors].) As the People point out, "we presume the trial court followed the law in exercising its duties and duly considered the evidence presented to it." (*Jones*, at p. 1092.) That presumption applies here. (Cf. *People v. Oliver* (2023) 90 Cal.App.5th 466, 488–490 [noting it was unlikely the trial court knew to consider the petitioner's youth where the resentencing hearing was held before cases addressing the issue were decided].)

Moreover, even though the court did not specifically mention Bowman's youth at the hearing, we cannot conclude that the court ignored it. Defense counsel raised youth as a consideration in briefing below, asking the court to consider Bowman's age when analyzing whether he acted with reckless indifference to human life. Then at the evidentiary hearing, Bowman's counsel reiterated that Bowman was "quite young," only "19 years old at the time," and the youngest of the three defendants. Absent any contrary indication in the record, we must presume the court properly considered Bowman's youth and its impact on his mental state. (*Jones, supra*, 86 Cal.App.5th at p. 1092 ["In the usual case, the fact that a court did not specifically mention certain evidence does not mean that the court 'ignored'

17

that evidence."].)  Accordingly, we discern no basis for remand on those grounds.

## DISPOSITION

The order denying Bowman's section 1172.6 petition is affirmed.


BUCHANAN, J.

WE CONCUR:


McCONNELL, P. J.


CASTILLO, J.